STATE OF VERMONT

ENVIRONMENTAL COURT

|  |  |  |
|---|---|---|
| | } | |
| In re: Hubbard Subdivision | } | Docket No. 207-8-06 Vtec |
| (Appeal of Cook, et al.) | } | |
| | } | |

Decision and Order

Appellants Constance Cook and her brother and sister-in-law Edward Dumas and Rosita Dumas appealed from a decision of the Planning Commission of the Town of Rutland, approving a final plat for a two-lot subdivision proposed by Appellee-Applicants Tracy and Nancy Hubbard. Appellants are represented by Kevin Candon, Esq.; Appellee-Applicants are represented by Matthew Branchaud, Esq.

Questions 1, 2, 4 and 5 of the Statement of Questions were dismissed in pretrial rulings, and the trial proceeded on Questions 3 and 6. Question 3 asks whether the Court should deny subdivision approval under § 185-5 of the Subdivision Regulations (specifically Subsection D) on the basis that the keeping of deer on the property "adversely affects the wells and drinking water of Appellants." Question 6 asks whether the Court should deny subdivision approval on that basis that the subdivision proposal "does not take into account protection for the wells and water supply for Appellant[s'] homes."

As the Court noted in its earlier motion decisions, this Court does not have jurisdiction over litigation of any property law or nuisance claims as among the parties regarding their wells or water supply, including any filed under the groundwater private right of action under 10 V.S.A. § 1410, so that all that is before the Court as to Questions 3 and 6 is whether the proposed subdivision meets the standards in the Subdivision Regulations with respect to the protection of shallow wells serving neighboring property from being affected by drainage from Applicants' property.

1

An evidentiary hearing was held in this matter before Merideth Wright, Environmental Judge. A site visit was taken on a date prior to trial with the parties and their representatives. The parties were given the opportunity to submit written memoranda and requests for findings but chose instead to submit oral argument by telephone shortly after trial. Upon consideration of the evidence as illustrated by the site visit, and of the oral argument presented by the parties, the Court finds and concludes as follows.

The undisputed facts as to the orientation of the parties' respective parcels was established in the first summary judgment decision and will not be repeated here except as necessary to establish the relative locations of the parties' properties.

All of the parties own land in the Town of Rutland accessed from Perkins Road. Appellee-Applicants own a 13.1-acre parcel of land containing their house, which they purchased in 2000 from Jeffery and Kimberly (daughter of Appellants Dumas) Elnicki. Appellant Cook's property adjoins the Hubbard property to the west. The property of Edward II and Shelley A. Dumas (son and daughter-in-law of Appellants Dumas, not involved in this litigation) adjoins the Hubbard property to the southeast. Other property of the Hubbard family, owned by a family trust and occupied by Appellee-Applicant Tracy Hubbard's father (not involved in this litigation) adjoins the Hubbard property to the southwest. The property of Appellants Dumas adjoins the Hubbard property to the north and east. Access to Perkins Road from Appellant Cook's property is via a separate private road not at issue in this litigation.

Access to Perkins Road for the remainder of the litigants is via a private road now known as Dailey Place, which runs from Perkins Road across other property owned by Appellants Dumas and across land now or formerly of the Rutland Fire Clay Company, and serves lands south of and uphill from that property. There appear to be three

residences now using the Dailey Place easement: the then-"present-residence" of Appellants Dumas referred to in the deed, that of the Hubbards, and that of Edward II and Shelley A. Dumas, to the south and uphill of the Hubbard Lot. Adjoining Appellee-Applicants' property uphill and to the south are other lands of the Hubbard family, owned by a trust and occupied by Appellee-Applicant Tracy Hubbard's father.

The land at issue in the present case is located essentially on the side of a mountain. The Hubbard property slopes steeply down from the south towards the north, and also slopes somewhat from the east towards the west at the northerly end of the property. The topography of the property is not depicted on the subdivision plan.

The private roadway serving the Hubbard property and continuing uphill to properties to the south is a steep gravel roadway with soils susceptible to erosion. The Hubbard house is located in the southeast (uphill) corner of the property, easterly of the roadway. The Hubbard house, its driveway, its septic system, primary leach field, and replacement leach field are depicted on the subdivision plan. A "couple of sheds" referred to in testimony as being located on the Hubbard house property are not shown on the subdivision plan. The garage serving the Hubbard house is not depicted on the subdivision plan. The topography of alterations to the roadway as it extends southerly and uphill of the Hubbard house is not shown on the subdivision plan. An additional earthwork or excavated roadway constructed above the Hubbard house is not shown on the subdivision plan. Some runoff has increased due to the construction of this roadway. A separate earth and stone ramp constructed above the Hubbard house by the Dumas for access to the upper Dumas property has changed the drainage patterns on the upper portion of the Hubbard property and caused Applicants to install an additional culvert to divert water from their driveway and house. Neither the ramp nor any upper culverts are shown on the subdivision plan, nor is the location of an existing spring behind the Hubbard house shown on the subdivision plan. Additional natural springs are located on Dumas

3

land above the Hubbard land.

The Hubbard property is wooded easterly of the roadway, and also near the westerly boundary of the property, and otherwise consists of meadows or pasture. The edges of the wooded areas are not shown on the subdivision plan. A barn is located on the property westerly of the roadway and is not shown on the subdivision plan.

A swampy area exists on neighboring property to the north (downhill) of the easterly side of the Hubbard property. A small watercourse extends along the northwesterly boundary of the Hubbard property and onto the neighboring property to the north of the westerly side of the Hubbard property; it is not shown on the subdivision plan

A portion of the property easterly of the roadway is fenced and houses New Zealand Red Deer. A feeding station is located on the easterly side of the roadway, uphill and across the roadway from the shallow wells.

Other areas accessible to livestock are located to the north of the barn, very near and uphill of the shallow well serving the Dumas property. Appellee-Applicants also keep deer, horses, chickens, ducks, geese, and dogs on the westerly side of the roadway; portions of the areas on the westerly side of the roadway are also fenced to enclose animals.

Appellee-Applicants propose to subdivide their 13.1 acre property into two lots, shown on the subdivision plat as Lots 2A and 2B. Lot 2A is a 9.7-acre parcel containing at least one agricultural building, several fenced enclosures, a drilled well and a shallow well. Lot 2B is a 3.4-acre parcel containing the house and garage. The continuation of Dailey Place uphill through the property runs through proposed lot 2A, and continues uphill past or through proposed Lot 2B to serve other property uphill and to the south of the subject property. Appellee-Applicants do not at this time propose any construction or further development of either of the subdivided lots.

Proposed Lot 2A contains an existing shallow well, close to its northerly boundary, that serves Appellants Dumas' house. The Dumas shallow well is located downhill from

4

the north side of the barn in a gully and is subject to receiving runoff from the south and from the southeast area across the road where the deer are enclosed. The gully was stable and about four feet deep in the past, but increased in depth in recent years due to erosion of the area from increases in excessive water flow. As of the time of trial, additional fencing had recently been installed to keep livestock away from the area between the barn and the Dumas well. None of the fencing is shown on the subdivision plan.

Another shallow well, serving the Cook property, is located just downhill to the north of the Hubbard property line. Proposed Lot 2A also contains a drilled well serving the Hubbard house, the water line for which runs within the east side of the easement of the roadway to the Hubbard house on proposed Lot 2B.

The Environmental Court is obligated in a de novo appeal to apply the substantive standards applicable in the tribunal appealed from. 10 V.S.A. § 8504(h); V.R.E.C.P. 5(g). Accordingly, the Court reviews this application under the Town of Rutland ordinance relating to the subdivision of land, Chapter 185 of the Rutland Code. A two-lot subdivision such as this one is considered a minor subdivision, Code § 185-12 and is only required to submit the final subdivision plat for approval. Code § 185-17(A).

Under § 185-25(B), the final subdivision plat is required to contain certain listed information and data. Section 185-25(B)(20) requires the final plat to contain "[c]ontour lines based on accurate ground surveys or a combination of ground and aerial surveys, at intervals of five (5) feet[,] of existing grades . . . . " Section 185-25(B)(19) requires the final plat to contain certain information not only for the subdivision property but to a distance of 100 feet onto adjacent land, including existing (and proposed) buildings (§ 185-25(B)(10)), existing (and proposed) watercourses (§ 185-25(B)(11)), private water supplies and lines, including sizes and elevations, existing and proposed (§ 185-25(B)(14)), and drainage systems including "showing culverts with rim and invert elevations, existing and

5

proposed." § 185-25(B)(15).

The fact that the buildings, culverts, watercourses and drainage patterns on this property already exist and will not be altered by the subdivision does not excuse the provision of these elements on the proposed final plat. The proposed final plat submitted in evidence by Applicants Hubbard lacks much of this required information, especially relating to the drainage patterns from this steep property. Most importantly, it does not show the contour lines for the property, does not show the drainage system of the property, including especially the seven culverts[1] about which there was testimony and photographic evidence at trial, and does not show all the springs, water supplies and watercourses about which there was testimony and other evidence at trial. Nor does it show the existing buildings on the property, other than the Hubbard house.

Without this information, the subdivision application may not be approved, even without regard to the issue of the adequacy of drainage, as the subdivision decision would not be enforceable without the required information being shown on the subdivision plat.

Beyond the inadequacies in the information provided on the subdivision plan, Applicants did not present sufficient evidence of the existing surface stormwater drainage patterns, and the existing or any proposed culverts or other drainage structures. The evidence presented suggests strongly that the stormwater drainage system in the recent past was not adequate to handle the natural flow of spring and surface water across the disturbed or agricultural areas of Applicant's property, without causing erosion or carrying contaminated water onto the neighboring property or into the shallow wells.

Applicants did provide evidence that they replaced one "rotted-out" or blocked culvert under the middle portion of the road, that another existing culvert conducted water

---

[1]  Two of these culverts were installed to divert water near the spring, two in relation to the roadway, and three up near the Hubbard house.

under the northerly portion of the road towards the spring serving the Dumas shallow well, that water from that culvert had washed out or eroded the bank near that spring, and that Applicants installed two additional culverts to conduct water past the area of the spring so that it would not sink into the ground near the spring.

It is apparent that the drainage system for the property as a whole was inadequate in the past, and that Applicants have done substantial work with the aim of improving the drainage system. However, without the depiction of the locations and sizes of all the culverts, road ditching, and water bars now in place, and without sufficient expert or other evidence that their current functioning is adequate and will continue to function adequately, the Court cannot determine that the drainage system as it currently exists is now adequate.

Rather, the Court concludes that Applicants have not carried their burden of showing that the proposal provides the "adequate surface stormwater drainage system for the entire subdivision area" required by § 185-35. This lack of evidence as to the drainage patterns makes it impossible for the Court to determine whether it is necessary to impose any conditions requiring Applicants to "carry away by pipe or open ditch any spring- or surface water that may exist either previous to or as a result of" the subdivision, as provided in § 185-35. Even if the seven culverts and associated site work done by Applicants over the last three years were now adequate to control the flow of surface stormwater, they would have to be shown on the subdivision plan in order to be an enforceable condition of approval for any subdivision application.

The Court also recognizes the broad "considerations" in subdivision review provided in Code § 185-5.[2] However, the subdivision plat is inadequate and the

_____

[2] Section 185-5(D) requires the "[p]rovision of adequate safeguards to protect the general public from the perils of . . . water pollution or other threats to public health . . . [;]" while §185-5(B) considers the "[r]ecognition of a desirable relationship to . . . groundwater and

7

subdivision cannot be approved, for the reasons stated, even without reliance on the general principles of § 185-5.

Based on the foregoing, it is hereby ORDERED and ADJUDGED that Applicants' application for final plat subdivision approval is DENIED. It will be for the Planning Commission, in the first instance, to determine whether to consider any subsequent application submitted with the information required by the Code.

Done at Berlin, Vermont, this 26th day of August, 2008.

_____
Merideth Wright
Environmental Judge

---

surface water hydrology, including the natural drainage pattern, and to the groundwater table."